GLENS FALLS INSURANCE COMPANY V. FRED W. MCCOWN.

No. A-2718. Decided January 10, 1951.
Rehearing overruled February 28, 1951.
(236 S. W., 2d Series, 108.)

588

*Allen Crowley* and *Edgar H. Keltner, Jr.*, both of Fort Worth, for petitioner.

The Court of Civil Appeals erred in holding that in interpreting a particular provision of an insurance policy, it was not entitled to consider or look at other provisions contained in the same policy; and when insured has accepted a provision against "external discharge or leakage of water" and there is another provision covering "external discharge or leakage of water" and "flood or rising waters" a person insured against the former but not the latter, is insured, nevertheless, against losses by flood. Said court also erred in holding that one of the worst and most disastrous, if not the worst, floods in the history of Fort Worth was a mere "external discharge or leakage of water". Missouri State Life Ins. Co. v. Carey, 276 S. W. 227; G. A. Stowers Furniture Co. v. American Indemnity Co., 15 S. W. 2d 544.

*Hyder & Honts, Wm. J. Chilcoat* and *John B. Honts*, all of Fort Worth, for respondent.

The Court of Civil Appeals was correct in its holding that the court could look to all the provisions of an insurance policy, even though some of them were not contracted for, as a means of interpreting those that were contracted for, and also in its holding that the provision of an insurance policy against risk of loss by "external discharge or leakage of water" was broad enough to cover a loss by overflow of waters from the Trinity

River. National Ben Franklin Fire Ins. Co. v. Brown, 253 S. W. 632; Goddard v. East Texas Fire Ins. Co., 67 Texas 69, 1 S. W. 906; Lewis v. Texas Finance Co., 136 Texas 149, 146 S. W. 2d 977.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

This is a suit by Fred W. McGown, respondent, against Glens Falls Insurance Company, petitioner, to recover on an insurance policy for water damage to seven automobiles. A trial court judgment for respondent was affirmed by the Court of Civil Appeals. 228 S. W. 2d 949.

As a dealer in automobiles, respondent bought from petitioner a policy which insured him against "direct and accidental loss of or damage to the automobile, hereinafter called loss, caused by windstorm, hail, earthquake, explosion, external discharge or leakage of water except loss resulting from rain, snow or sleet."

Respondent kept his automobiles on a lot in a lowland section of Fort Worth. In May, 1949, an unprecedented rain fell over much of the watershed of the Trinity River; the Trinity left its banks, engulfed the levees along its banks and overflowed a large part of the city, including respondent's lot. The seven automobiles were submerged to such depth that the water covered their speedometers, panel boards, motors, transmissions and differentials. Respondent claims the resulting damage was caused by an "external discharge or leakage of water" under the policy language above quoted.

The policy showed 8 coverages designated as A, B-1, B-2, C, D, E, F, and G. Preceding these coverages, under the heading of "Declarations", was "Item 3", which provided: "The insurance afforded is only with respect to such and so many of the following coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be as stated herein, subject to all the terms of this policy having reference thereto." Respondent's policy showed premium charges only on Coverages B-1, C, D and E. His claim is under Coverage E, the material parts of which are quoted above.

Coverage F, as to which no premium charge was made in respondent's policy, was designated as "Combined Additional Coverage" and read as follows: "To pay for direct and accidental loss of or damage to the automobile, hereinafter called

loss, caused by windstorm, hail, earthquake, explosion, riot or civil commotion, or the forced landing or falling of any aircraft or of its parts or equipment, *flood or rising waters,* external discharge or leakage of water except loss resulting from rain, snow or sleet." (Italics ours.)

As relating to the issue at bar, the language of Coverage E is identical with that of Coverage F, except that the latter includes the phrase "flood or rising waters."

Petitioner contends that the water which damaged respondent's automobiles was flood water; that since Coverage E, which was accepted and paid for, did not insure against flood waters whereas Coverage F, which was not taken and paid for, did insure against flood waters, respondent's policy expressly failed to cover the damages sued for, and that respondent had notice of that fact when he received the policy.

Respondent counters that since Coverage F was not taken and paid for, it is no part of the policy and cannot be considered in construing Coverage E relating to external discharge or leakage of water.

In regard to automobile insurance, Section 5, of Art. 4682b, Vern. Ann. Civ. Stat., directs that "the Commissioner shall prescribe *policy forms* for each kind of insurance *uniform in all respects* except as necessitated by the different plans on which the various kinds of insurers operate, *and no insurer shall thereafter use any other form* in writing automobile insurance in this State." (Italics ours.)

A member of the agency which issued respondent's policy testified as a witness for petitioner: "The policies are all what we call OK'd by the Board of Insurance Commissioners at Austin and all companies use the same standard form." He swore that the form used in issuing respondent's policy· "has been OK'd by the Board at Austin", and that all the several companies he represents "use this identical policy." This testimony does not appear to have been controverted by respondent, so we may assume that his policy was what is known as a "standard form"; that is, it was in the form prescribed by the Insurance Commission of this state under the terms of the statute above quoted.

The purpose of the supervision and control of insurance in Texas by the Commission is to serve the public interest in that

business as well as to protect the rights of both insurer and insured. As a part of, and as an aid to, that supervision and control the Commission was authorized and directed to prescribe a uniform standard automobile insurance policy so that all parties at interest may know what their respective rights and obligations are under it.

■ Thus every measure of protection this standard policy could possibly afford the insured under petitioner's plan of operation is set out in eight different "coverages" following the plain and specific statement that *"the insurance afforded is only with respect to such and so many of the following coverages as are indicated by specific premium charge or charges."* So when respondent received the policy in question from petitioner's agents the language just quoted invited him to look at his policy, and if he did so he could see that his automobiles were insured against only the risks designated by Coverages B-1, C, D and E, because only against those were premium charges made— it was only for insurance against those risks that he was undertaking to pay. Conversely, by reference to Coverages A, B-2, F and G, against which no premium charges appeared and for which he therefore knew he was not being charged, he could just as easily determine what risks petitioner was not insuring him against. By reading Coverage F he could discover that he was not insuring his automobile against damage from flood waters for the obvious and sufficient reason that he was not paying for any such insurance.

The parties agree that there is no Texas case in point and we have found none. However, Henry v. Dubuque Fire & Marine Ins. Co., 185 S. W. 2d, 658, by a Missouri Court of Appeals, is almost paralled with the case at bar. The opinion is not clear as to the terms of the policy. But petitioner says in its application that it got from the clerk of that court an abstract of the record in that case, and its statement as to what the abstract discloses is in no manner challenged by respondent. According to petitioner, that abstract shows that (1) the policy in suit had 10 available coverages, including E and F; (2) Coverage E was designated as "Windstorm, Earthquake, Explosion or Hail" and bound insurer "to pay for loss of or damage to the automobile hereinafter called loss, caused by Windstorm, Earthquake, Explosion, Hail or *External Discharge or Leakage of Water"*; (3) Coverage F was called "Combined Additional Coverage" and by it the company agreed "to pay for loss of or damage to the automobile hereinafter called loss, caused by Windstorm, Earthquake, Explosion, Hail, *External Discharge*

*or Leakage of Water, Flood or Rising Waters,* Riot or Civil Commotion, or the Forced Landing or Falling of any Aircraft or of its parts or equipment"; (4) that there, as in the case at bar, the insured had contracted for Coverage E but not for Coverage F; (5) that in his petition Henry alleged purchase and delivery of a policy by which the defendant company "insured this plaintiff against certain hazards in said policy set forth, and among others against loss of or damage caused by windstorm, earthquake, explosion, hail or *external discharge or leakage of water,* to the Chevrolet automobile described in said policy, in an amount equal to the actual cash value of said automobile" and that "on the 30th day of May, 1942, and while said policy was in full force the said automobile *was damaged by the external discharge and leakage of water * * *."* (Italics ours.)

Referring now to the opinion (185 S. W. 2d, 658, 659), the court says that on the date mentioned in plaintiff's petition he and another were fishing, when a heavy rain came and caused the river to rise; that they were unable to drive the automobile across the river to safety but were compelled to leave it in the stream; and that the automobile was completely covered by the *rising water.* Then the court says, "The policy in force at the time did not cover F", and, after quoting F, as above, it adds: "In other words, *the policy* issued January 11, 1942, *expressly failed to cover the very damage sued for."* (Italics ours.)

A closely analogous case is Witherspoon v. Lumbermen's Mut. Ins. Co., 211 Ark. 844, 203 S. W. 2d., 185, by the Supreme Court of Arkansas. Witherspoon sued on his automobile policy for damages caused to his automobile when it went off the road and turned over in a ditch. His policy recited: "In consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy, the company agrees to pay for direct and accidental loss of or damage to the automobile, * * * *with respect to such* and so many of the following *coverages as are indicated by specific premium charge or charges".* (Italics ours.) The only premium charge shown was opposite Coverage A, which was designated as "Comprehensive—Loss of or Damage to the Automobile, Except by Collision" and defined as "any loss of or damage to the automobile except loss caused by collision * * * or upset of the automobile * *." Coverage B-1 for "Collision or Upset"; B-2 was for "Convertible Collision or Upset"; but no premium charges appeared opposite either of them. In that fact situation the Court said:

"It appears certain that the insured here did not intend to pay for, nor did the company intend to accept the risk for damages which arose from an 'upset' of the truck. Item 3, supra, of the insurance contract definitely limited the insurance to the 'Coverage as hereinafter defined', for which appellant, the insured, paid a 'specific premium charge * *'.

"His total annual premium, as shown in Item 3, was $24.00 for 'Coverage A'—Comprehensive—Loss of or Damage to the Automobile, Except by Collision but including Fire, Theft and Windstorm', and 'Coverage A' as 'Defined': 'any loss of or damage to the automobile except loss caused by collision * * * or upset of the automobile'.

"Appellant paid no premium for Coverage 'B-1, Collision or Upset' or for 'B-2, Convertible Collision or Upset.' Since he paid no premium for 'upset' coverage, and since such coverage is expressly excepted from the policy coverage for which he did pay, we think it clear that the parties intended, and without ambiguity, expressed their intention that damages to the truck resulting from an 'upset' were excluded and not covered."

(It will be observed that while the court gave consideration to the fact that Coverage A, which was paid for, excluded damage from upset of the insured automobile, it also gave weight to the fact that Witherspoon paid no premiums for insurance against upset as defined in Coverage B-1 and B-2.)

We have concluded that these cases announce a sound rule. By using a form of policy devised and approved by our Insurance Commission petitioner offered respondent eight separate and distinct coverages for his automobile and by Item 3, above quoted, informed him that he had accepted only four of them (including Coverage E) because they were followed by specific premium charges and that he had rejected the other four (including Coverage F) because they were not followed by specific premium charges. By retaining the policy respondent accepted petitioner's offer. The coverages offered but rejected are in the policy (under the direction of the Insurance Commission) the same as are those offered and accepted, therefore it is proper to consider all of them in determining the respective obligations and rights of the parties to the policy. Only on that basis can our public policy in prescribing uniform policies be served.

That the damage done to respondent's automobiles was caused by a flood cannot be seriously questioned. That Covererage E's protection against external discharge or leakage

of water did not include, and was not meant to include, an unprecedented overflow of the Trinity River onto a large portion of the City of Fort Worth is made perfectly clear by reference to Coverage F, which offered to insure respondent not only against external discharge or leakage of water but against flood or rising water as well. Since respondent did not accept and pay for Coverage F, he "expressly failed to cover the very damage sued for" and cannot recover.

The judgments below are reversed and judgment is here rendered for petitioner.

Associate Justice Wilson not participating.

Opinion delivered January 10, 1951.

MR. JUSTICE SMITH, joined by JUSTICE SHARP, dissenting.

I regret that I must dissent from the view taken by the majority of the Court in the disposition of this case. I will omit a restatement of the facts set out in the majority opinion, but I will add such additional facts as I deem pertinent.

From the evidence taken in the trial of this cause it appears that the respondent relied upon the judgment and advice of a Mr. Turner, an insurance agent of the petitioner, in the selection of the coverage he paid for in the contract of insurance sued upon. He and Mr. Turner were friends and had discussed his need for insurance on his stock of used cars. Mr. Turner was familiar with respondent's type of business and purported to understand his needs as to insurance coverage relating to such business. Mr. Turner never talked over or explained to respondent the extent of his coverage in the policy which respondent now sues on. Mr. Turner would send respondent a policy each year along with his bill which respondent would pay.

At this point it might be well to call attention to the form of the policy involved in this case. The petitioner contends that the contract was written by using a Texas Standard Policy form which had been prescribed by the Insurance Commissioners of this state; that by virtue of the use of such form the insured could not possibly be misled or deceived as to the coverage contracted for.

Now suppose we examine the policy. At the top of the first page, we find printed the words "Texas Automobile Policy".

Next, we find "Glens Falls Insurance Company, Glens Falls, N. Y. A Stock Insurance Company, herein called the Company". Next, we find the word "Declarations". The first declaration made by the Company is that it named the insured as Fred W. McCown. The next declaration which has a direct bearing on the issue involved is printed in extra large capital letters as follows: "Coverage - E - Windstorm, Earthquake, Explosion, Hail or *Water*" (italics mine) and opposite you find the amount of the premium.

Again dealing only with the pertinent portion of the policy, we find the signature of the Turner Insurance Agency appearing at the bottom of the first page. Also appearing on this first page, we find another possible coverage, to-wit: "F-Combined Additional Coverage." However, no premium was paid for this; therefore, Coverage F forms no part of the contract.

All of the above quoted provisions stand out in bold relief on the first page of the policy over the signature of the agent of the Company.

Then follows page 2 of the policy which is a much longer page than the first and at the top of the page we find the words "Automobile Dealers' Monthly Reporting Form-Form 3."

It will be noted that although page 2 is designated as above stated, yet a reading of the entire page will clearly convince anyone that there is not a single provision relative to the designated subject and we further stress the fact that this page does not contain any provision pertaining to the issues involved in this case.

Now we turn to page 3 and find at the top of the page the words "Glens Falls Insurance Company, Glens Falls, N. Y. (A Stock Insurance Company, herein called the Company)." Then follows in fine print a more detailed explanation of the Coverage "E", and instead of using the word "water", the following words are used in lieu thereof; "external discharge or leakage of water except loss resulting from rain, snow or sleet". Then follows a more detailed explanation of the meaning of Coverage "F" and for the first time we find the words "flood or rising waters * * *". Bear in mind that Coverage "F" was not contracted for and also keep in mind that on page 1 of this policy Coverage "F" only contains the "Combined Additional Coverage". Therefore, we are of the opinion that the additional provision in Coverage "F" on page 3 cannot in any manner be

used to vary the terms of the contract agreed upon by the parties. Granting for the sake of argument that all provisions of the policy, including section "F", may be considered in determining the intention of the parties, it still remains our firm conclusion that the damage sustained by respondent is properly recoverable under Coverage "E".

From the face of the policy it appeared that respondent was covered against loss caused by B-1, "Collision or Upset"; C, "Fire, Lightning, and Transportation"; D, "Theft"; and E, "Windstorm, Earthquake, Explosion, Hail *or Water*" (italics mine.). It is noted that Coverage "F", which petitioner claims covers the loss complained of rather than Coverage "E", is listed as "Combined Additional Coverage" which gives no hint as to the extent or nature of its coverage as do all of the other listed coverages.

Of course, respondent must recover under the terms of Coverage "E", or not at all. Therefore, our sole question for determination is, does the wording of Coverage "E" of the policy set out on the face of such policy as "Windstorm, Earthquake, Explosion, Hail or Water" and defined in another part of the policy as "To pay for direct and accidental loss of or damage to the automobiles, hereinafter called loss, caused by windstorm, hail, earthquake, explosion, external discharge or leakage of water except loss resulting from rain, snow, or sleet", which is the coverage contracted for, cover the loss sustained by respondent, *and not whether Coverage "F" not contracted for, would also cover the loss.* (Italics mine.)

We are met at the outset by the familiar and long established rule of construction that insurance policies will be construed liberally in favor of the insured. McCaleb v. Continental Gas Co., 132 Texas 65, 116 S. W. 2d 679, and cited cases. Therefore, if the loss sustained by respondent can reasonably be said to have been caused by an "external discharge or leakage of water," then he must recover.

As stated by the Court of Civil Appeals in its opinion, 228 S. W. 2d 949, 951, "It is plain that the parties intended that the policy should insure against some kind of damage caused by water. Under the argument advanced by the insurer, the coverage was rather narrow. It was intended to include only damage caused by leakage of a rather small amount of water, or discharge of water from some place of confinement, as from water pipes, for instance." It must be borne in mind that

petitioner's agent, Mr. Turner, was familiar with respondent's type of business and selected his coverage for him, or at least advised him concerning such coverage. If Coverage "E" was intended to cover only those losses contended for by petitioner, how could respondent possibly suffer such a loss, when you consider the location of the automobiles damaged? Since the cars were located on an open lot, there were no pipes running overhead from which a leak or discharge might spring. To adopt the construction advanced by petitioner would render the contract of insurance relating to water damage an empty and hollow thing. Such a construction would lead to the conclusion that Mr. Turner sold respondent insurance that he (Mr. Turner) knew there was no need for. In the absence of proof to the contrary, we must assume that Mr. Turner did his job in an ethical and competent manner.

The evidence is uncontradicted that part of the water causing respondent's loss was water which flowed over or broke through the levees erected to protect the lowlands, upon which respondent's used car lot was located, from the flood waters of the Trinity River. These levees were erected some distance from the river to contain the water after it rose out of the banks of the river. Their very purpose was to hold back such water and confine it to the area between the levees. When some of this flood water poured through an opening in the levee or over the top of such levee, it escaped its confinement, and it was this water that caused respondent's loss.

Webster's New International Dictionary, Second Edition, defines the word "discharge" as a removal, an unloading, a release from confinement, a flowing or issuing out. Throughout these definitions runs the idea of release of a person or object from a place of restriction or confinement. I agree wholeheartedly with that part of the Court of Civil Appeals opinion, 228 S. W. 2d 952, which says, "If a dam should break, it seems to us that the ensuing flow of water would probably be called a discharge of water from the lake. Likewise, if a levee should break and release water from the channel where it had been confined, it seems to us that it would be proper to call it a discharge of water from such channel. We also think it would be proper to term the flow of water over the top of a levee as a discharge of water from the channel made by the river and levee system within which it would normally be contained." It takes no stretch of reason to say that it was an "external discharge or leakage of water" which caused the injury to respondent's property.

"Flood or rising waters" is much more general in nature than is the "external discharge or leakage of water", and would cover many instances that the latter would not, but that does not mean that in some circumstances both could not be applicable. Under some situations water could be flood water and at the same time be an "external discharge or leakage of water." In this connection it is noted that Coverage "E" did not expressly exclude liability for loss caused by "flood or rising waters."

The term "flood or rising waters" describe a type or kind of water distinguishing it from tidal water or rain water. The term "external discharge or leakage of water" relates to an event or a happening. It does not describe a type or kind of water as does the former term.

In the case before us it cannot be seriously questioned, nor is it questioned, that the loss incurred by respondent was caused by flood water. The water that overflowed the banks of the Trinity River was flood water and continued to be flood water. However, when the flood water rose to such heights as to pour over or break through the levee, such water also constituted an "external discharge or leakage of water". It was this event, this "external discharge or leakage of water", that caused respondent's loss, and it was this event that he insured against by the express terms of Coverage "E".

The parties having agreed that there are no Texas cases in point, the majority gives considerable weight to the case of Henry v. Dubuque Fire & Marine Ins. Co., 185 S. W. 2d 658, by a Missouri Court of Appeals. However, that case is easily distinguishable on the facts. In the Henry case it appears that the automobile upon which the policy of insurance had been taken was damaged when the insured was compelled to leave it in a stream when he was unable to drive it across. In that case there was no "external discharge or leakage of water", the river merely continued to rise until it engulfed the car which had been left within the stream. The automobile in that case was damaged by "flood or rising waters" as were the automobiles in this case, but there the similarity between the two cases ends, for, as has been stated, in the Henry case there occurred no "external discharge or leakage of water" as in the instant case. Had the automobiles in this case been located between the levees, there would probably be no grounds upon which respondent could recover, but the cars having been located outside the levees, they were damaged by an "external discharge or leak-

age of water" when the flood water flowed over or broke through the levee and engulfed them.

Attention is again called to the fact that, according to the evidence, the levees were a considerable distance from the river, and we further find from an examination of the evidence that the hard rain actually began on May 16, 1949, and that the external discharge of water from the levees did not occur until some time on the morning of May 17, 1949, which demonstrates clearly that the levees did in fact contain the water for several hours before the break in the levees occurred and the water was discharged causing the damage to respondent's automobiles.

From the evidence in this case it is clear that the insurer, the petitioner herein, was thoroughly familiar with the location of the lot upon which the automobiles were situated and, no doubt, in passing upon the advisability of assuming the risk by issuing the policy, took into consideration the comparative safety because of the situation of the levees, and that to that extent it was beneficial to the insurer to provide Coverage "E" for the respondent in this case.

For these reasons I believe that respondent is entitled to recover, and that the judgment of the trial court and the Court of Civil Appeals should be in all things affirmed.

Opinion delivered January 10, 1951.

Rehearing overruled February 28, 1951.