## ARSHACK ETC. *v.* CARL M. FREEMAN ASSOCIATES, INC.

[No. 218, September Term, 1970.]

*Decided January 5, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Joseph Forer* for appellants.

*John F. Ward,* with whom were *Shapiro, Weil & Jacobs* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Danny Arshack cut his foot on a piece of glass. The appellant (Mrs. Arshack), for herself and as Danny's mother and next friend, sued the appellee (Freeman). The trial judge, Jos. Mathias, J., at the close of the whole case, directed a verdict in favor of Freeman and in so doing, says Mrs. Arshack, he fell into reversible error. He may have teetered but we do not think he fell.

Americana Park is a cluster of 20 seven-story apartment buildings erected by Freeman on a 54 acre tract in Prince George's County. In July 1967 Mrs. Arshack, her daughter and 11 year old son, Danny, occupied apartment A10 in the building known as 1824 Metzerott Road and as tenants they were entitled to the free use of the grassed areas around the buildings. At dusk on Friday, 21 July, Danny, barefooted, walked across the grass to the rear of a neighboring building, 1820, to converse with a friend. As he paced about on the grass he stepped on a piece of green glass "embedded * * * in the dirt and part of it * * * sticking out of the dirt." He thought it was "from a broken bottle." "And that is what * * * [he] suppose[d] * * * [he] cut [him]self on." The grass, he continued, was "about four inches high" and the glass "was down at the bottom * * * as if the grass had grown up around it, * * * it was [not] clearly visible from any distance" and that he saw it at all was due to the fact that "the grass was pressed down after * * * [he] stepped on it."

Danny agreed he "went barefooted often that summer" and that "a lot of other people went barefooted." Hardy Alston, Freeman's grounds superintendent, estimated that "about ninety percent" of the tenants went around barefooted. Mrs. Arshack admitted that at times she herself "went barefooted." Asked if she objected to Danny's going barefooted, she replied:

"I think like most parents I registered a *symbolic* objection from time to time, without great success. I don't think I had objected to it around that time, no. [Emphasis added.]

"Yes. I had, as a matter of fact. I'm sorry. About a week or so before that, in fact, I remember it was prior to a baseball game, I got rather disturbed about it and said I did not approve in principle about his going barefooted because there was a lot of stuff around and I was concerned about it and I preferred he'd wear something on his feet.

"Q. Did you tell him that he had to wear something? A. We don't live that way."

Mrs. Arshack moved into Americana Park in August 1966. She was asked to testify in respect of "the general nature of the upkeep of the grounds in Americana Park in July of 1967 prior to July 21." She spoke vaguely of complaints by her and "many other tenants," none of whom were identified. She said there "was not only trash and broken glass outside on the grounds but even in the downstairs hall" of the building (1824) in which she lived. She said she complained to "the maintenance people" more than once but she could not say how many times. She telephoned to the office once and spoke to "the lady." She could not remember how soon before 21 July she telephoned the office but later on, when pressed by Judge Mathias, she put it "within a few weeks prior to the time of Danny's accident." She "supposed" the "disposal people" spilled some of the trash when they emptied the incinerator. Again responding to Judge Mathias's question, "did * * * [she] ever see any trash or glass" behind 1820, she said she "didn't spend very much time over there." But she insisted there were "bits of trash and glass in the area in general" and "there was some there [at 1820] too." Whenever she saw glass she "would pick it up and throw it away." On 22 July, the day following

the accident, she said she looked "at the rear of 1820" and that "there was still glass there * * * it was in the grass * * * [she] thought it was a broken Coke bottle." The record leaves in doubt the question whether she picked up this specific piece of glass; later she said she did not have it.

Hardy Alston, 35 at the time, testified that seven of his eleven years with Freeman had been spent at Americana Park. In the summer of 1967 he supervised the work of nine men who were quite enough to keep "Americana Park spic and span." Every morning, Saturdays and Sundays excepted, beginning at 8:00 a.m., they policed the entire development "picking up * * * anything * * * on the ground regardless [of] whatever it * * * [was] ; beer cans, paper, rags, clothing, coat hanger[s], anything [junk] that they * * * [saw] on the ground." In addition to his nine men there was a "building custodian" for each two buildings. Alston said it was the "duty [of the building custodians] in the morning to police the area around their buildings and in between the two buildings"; in the afternoon they were required "to double check to make sure" the area had been policed. He said any report or complaint about trash or glass would be "taken care of immediately" even if he had to do it himself. He said also that the area around 1820 and 1824 got a "little more attention" than other areas because prospective tenants came there for information, advice and to inspect model apartments. All of the grass was cut once a week but around 1820, 1822 and 1824 it was cut again on Friday. They "never cut it shorter than three inches." He said his men did no work inside the buildings and that a contractor looked after the swimming pool. Questioned about the number of complaints in the summer of 1967 he could not think of any because as he put it "there's very few that we really had concerning the grounds * * * maybe two a year." Asked if he ever picked up "any glass from the grounds" he said occasionally they found glass especially after the trash people had emptied the incinerators and, in this regard, they had "a

special duty" after the trash people left to clean up any trash they might have dropped.

In the early morning of Monday, 24 July, Alston learned from the superintendent of janitors that "somebody got hurt or claimed they got hurt" on Friday. Alston said he immediately checked the area around 1820 but he did not find any glass there. While Alston did not work on Saturday and Sunday he said there was a building custodian on duty during the weekend and that he would have picked up the glass if he had seen it or if he had been told about it.

Except for the hospital record, the doctor's report and his bill, all of which were admitted by agreement of counsel, the only evidence offered by the appellant was the testimony of herself and Danny. When counsel informed the court that the plaintiff had rested, Freeman moved for a directed verdict. Judge Mathias reserved his ruling on the motion but Freeman by offering evidence withdrew it. Maryland Rule 552 b. If, however, Freeman had elected not to offer evidence and to stand on his motion Judge Mathias would have been faced with a more difficult decision but, since it is not required of us, we shall not undertake to say whether the direction of a verdict in those circumstances would have been correct or incorrect. Freeman's evidence effected a marked change in the complexion of the case and his motion at the close of the evidence put before Judge Mathias a less difficult decision. In *Smith v. Bernfeld,* 226 Md. 400, 405 (1961), Chief Judge Brune, for the Court, after restating the general rule for testing the sufficiency of the evidence in reviewing a motion for a directed verdict, or judgment n.o.v., said:

> "A difficulty may arise in a case such as this where the defendant offers evidence to show some fact or facts by way of defense. Such evidence, where the facts are conceded or are undisputed, *may be considered in reviewing a ruling on a motion for a directed verdict* or in en-

tering judgment *n.o.v.*, but may not be so considered if the evidence is merely uncontradicted, if its truth is controverted." (Emphasis added.)

And *see Peroti v. Williams*, 258 Md. 663, 669 (1970); *Sachs v. Little*, 245 Md. 343, 363 (1967); *Lehman v. Baltimore Transit Co.*, 227 Md. 537, 541 (1962).

It is quite well settled, of course, that where a landlord leases separate parts of his property to different tenants and reserves other parts of the property for the common use of all tenants his duty to them rises no higher than the exercise of ordinary care and diligence to maintain the retained parts in a reasonably safe condition. *Windsor v. Goldscheider*, 248 Md. 220, 222 (1967); *Langley Park Apts. v. Lund, Adm'r*, 234 Md. 402 (1964); *Landay v. Cohn*, 220 Md. 24, 27 (1959). We think Alston's testimony puts Freeman well within the bounds of the required ordinary care and diligence. It was neither contradicted nor controverted and its presence requires a reappraisal of the inferences which might otherwise be drawn properly and legitimately from the testimony of the appellant which, it may be observed, is more remarkable for what it does not prove than for what it does prove. Danny's testimony contains the sum total of available information about the piece of glass. It was green; it was partially embedded in the dirt; to the casual observer it was invisible; the grass had grown up around it; he "supposed" he stepped on it. Mrs. Arshack looked for it the next day. She saw what she thought was a piece of a "Coke bottle." It is a pity she did not retrieve what she saw. Laboratory tests might have revealed traces of what might have been Danny's blood, establishing it, perhaps, as the piece he did step on. Alston looked for it but he did not find it. It seems quite possible to us that whatever Danny stepped on may have been there for seven hours, seven days, seven months or seven years. However long it may have been there, the record has nothing in it to suggest that any lack of ordinary care and diligence on the part of Freeman was responsible for its presence behind 1820 at dusk on 21 July 1967. Mrs.

Arshack says she made at least one complaint about trash and glass and that an unspecified number of other persons complained. Assuming the truth of her statement, as indeed we must, and viewing it in the light of Alston's testimony that if there had been a few complaints, and he said there may have been a few, they would have been taken care of immediately, which, of course, serves to dissipate any inference of a lack of ordinary care and diligence. Also serving to dissipate any such inference is Alston's description of the daily routine of his work force, the special attention given to 1820, 1822 and 1824, the surveillance of the work of the trash people and the area policing duties assigned to the building custodians. Nor does Mrs. Arshack's testimony in respect of "bits of trash and glass in the area in general" provide a source for a proper and legitimate deduction that there was a want of ordinary care and diligence on the part of Freeman. She did not say when she saw the "bits of trash or glass" or precisely where she saw them; she did not say she saw them more than once in the same place; she did not say she notified anyone of the location of the "trash or glass" that she saw. Considering her statement in the light of Alston's testimony one is obliged to conclude that if she did see any trash or glass, Alston's men must also have seen it, since they were looking for it, and that if they saw it they picked it up. It seems hardly necessary to observe that such an "immense development" inevitably generates an equally immense amount of trash and that one could expect, from time to time, to see bits of it here and there on the grounds. Were it not so Alston and his gang would be out of jobs.

Finally there is the barefoot phenomenon. Although "there was a lot of stuff around" and she "was concerned about it," she did not tell Danny to "wear something on his feet." Instead she "registered a symbolic objection from time to time" but here we must confess ignorance —we are not big in the field of "symbolic objections." Perhaps because she often went barefooted herself Danny did not quite understand the symbols.

Quite recently, in *Isen v. Phoenix Assurance Company,* 259 Md. 564, 571 (1970), we said:

"The trial judge should be mindful, however, that the words 'legally sufficient' have significance. As Chief Judge Prescott said, for the Court, in *Fowler v. Smith,* 240 Md. 240, 247 (1965):

'* * * They mean that a party who has the burden of proving another party guilty of negligence, cannot sustain this burden by offering a mere scintilla of evidence, amounting to no more than surmise, possibility, or conjecture that such other party has been guilty of negligence, but such evidence must be of legal probative force and evidential value.' "

In *Gatling v. Sampson,* 242 Md. 173, 182 (1966), Judge Prescott said, for the Court:

"An examination and an analysis of the evidence convince us that there is nothing therein upon which to base primary negligence except conjecture, pure and simple. The principle that the evidence and proper inferences therefrom must be considered in a light most favorable to the plaintiff when determining whether to take a case from the jury on the ground of no proof of primary negligence does not require the taking of isolated sentences, or parts of sentences, in the testimony, and construing them out of context, without any regard to the rest of a witness' testimony. The testimony to establish primary negligence must be credible; and that which is incredible should be disregarded. *Cocco v. Lissau,* 202 Md. 196; *York Motor Express Co. v. State,* 195 Md. 525; *Olney v. Carmichael,* 202 Md. 226. Cf. *So. Md. Electric v. Blanchard,* 239 Md. 481."

To the same effect *see Rodriguez v. Lynch,* 246 Md. 623, 626 (1967).

While a somewhat different factual situation was presented in *Chesapeake & Potomac Telephone Co. v. Noblette,* 175 Md. 87 (1938), the comment of Judge Parke, who wrote for the Court, is of interest here. He said:

"It is upon this vague, inconclusive and contradictory testimony that the court is asked to hold that there is on this record legally sufficient testimony to go to the jury for the jurors to find that the mill was not directly struck by lightning which thus set it on fire, but that the ignition was caused by an induced current which was conducted into the mill by the telephone wires as far as the telephone, which was set on fire, and thus the office and mill, by the failure of the lightning arrester to function because the ground wire had become disconnected by its severance a few feet above the ground. For the purpose of a demurrer prayer the invariable rule is that the court must assume as true all the testimony, and its reasonable inferences, in so far as they tend to support the right of action of the plaintiff, *but this rule does not require the acceptance as true of the testimony of a witness when that testimony is so vague, indefinite and self-contradictory as to be plainly of no probative value on the vital issue of fact which is here involved. Slacum v. Jolley,* 153 Md. 343, 351, 138 A. 244.

"The court must, and does, disregard in this connection all the testimony on the part of the defendant in denial that the ground wire had parted, and that any information had ever been given the telephone company of any such condition. But after this is done, the court does not find [that] legally sufficient testimony remains for its consideration to submit to the jury the

right of the plaintiff to recover. *The reason is that at most the testimony offered is circumstantial, and, before it may be accepted as legally sufficient to support the requisite inference that the fire was caused by induced lightning being grounded by an imperfect lightning arrester, there must not affirmatively appear on the record uncontradicted and inherently probable facts which make such an inference untenable.* The significance of this fact lies in this, that the telephone in the mill was on a party line on which there were nine or eleven subscribers. If any one of these services were interrupted by lightning destroying the mechanism of its telephone by fire, the service of all would be interrupted until the necessary changes and repairs were made." *Id.* at 96-97. (Emphasis added.)

It seems to us that Alston's testimony affirmatively presents "uncontradicted [, uncontroverted,] and inherently probable facts which make * * * [the claimed inferences from Mrs. Arshack's testimony] untenable." Thus it would seem to follow that the evidence does not rise above the level of surmise, possibility or conjecture that Danny's injury was the result of a lack of ordinary care and diligence on the part of Freeman. We shall affirm the judgment below.

*Judgment affirmed.*
*Costs to be paid by the appellant.*