330

# A. B. VEIRS, INC. *v.* LESTER W. MYERS ET AL.

[No. 32, September Term, 1973.]

*Decided November 21, 1973.*

The cause was argued before THOMPSON, MENCHINE, DAVIDSON and MOORE, JJ.

*Charles W. Bell* and *Michael J. Ragland,* with whom were *John T. Bell, Frank S. Cornelius* and *Bell & Bell* on the brief, for appellant.

*David M. Buffington* and *J. Thomas Caskey* for appellee C. Clifton Veirs and *Charles C. Bowie,* with whom were *Brault, Scott & Brault* on the brief, for other appellee.

MENCHINE, J., delivered the opinion of the Court.

For nine years prior to March, 1971, the trucking fleet of the appellant A. B. Veirs, Inc. had been insured by Aetna Life and Casualty Company [Aetna]. The Aetna policy had included a provision for payment for: "Combined additional [loss] caused by (a) windstorm, hail, earthquake or explosion, (b) riot or civil commotion, (c) the forced landing or falling of any aircraft or its parts or equipment, (d) *malicious mischief or vandalism,* (e) flood or rising waters, or (f) *external discharge or leakage of water."* [Italics supplied]

It is claimed that the loss in the subject case would have been covered by one or both of the italicized subsections of the policy.

Aetna declined to renew the insurance for the year beginning March, 1971 and so advised the appellee, C. Clifton Veirs, Jr., t/a C. Clifton Veirs Agency [Veirs Agency] who through the years had placed the insurance of the appellant A. B. Veirs, Inc. The Veirs Agency was directed by appellant to secure insurance providing identical coverage. The Veirs Agency represented one other insurance company that also declined to write the insurance risk of the appellant. The Veirs Agency then contacted the appellee Lester W. Myers [Myers], an agent representing Fireman's Fund Insurance Company [Fireman's]. A policy was written by Fireman's that did not provide the coverage hereinbefore quoted.

The appellant, maintaining that it had sustained a loss

that would have been covered by the Aetna policy, brought suit for breach of contract and in tort against Veirs Agency; and in tort against Myers, for the alleged failure to obtain an identical policy.

The liability *vel non* of Veirs Agency or Myers necessarily must be determined by the terms of the Aetna policy.

Appellant in early 1971 purchased a used tractor (mileage 60,000 to 65,000). After use for about 40,000 miles in local hauling of a dump trailer, it was decided "to take the tractor and go over it completely and put it on a long distance haul." Alvin B. Veirs, president of the plaintiff corporation, testified that in early November, 1971: "We went over it, the truck, put new hoses, new fan belt, tightened up everything; checked the oil, anti-freeze, filters and put new tires on the front because this truck was going to go from Baltimore to Pittsburgh, to Wheeling, West Virginia, where it's rough. Q. You say 'we went over it' you did it? A. My mechanics and myself. Q. You yourself. You were actually involved yourself in it? A. Yes, I did." The witness had many years experience in truck repair and maintenance and had changed water hoses on trucks of this type many times before. He said he noticed that the hose on the truck was cracked; that he had obtained new hose and clamps and had pulled the old hose, replacing it with new hose of the same length and affixing it by a new clamp. The work was done in Rockville. The tractor then was taken to Frederick, where it passed ICC inspection and was left at the terminal of the Comet Freight Lines. At least three persons, none called as witnesses, operated the vehicle in the Frederick area.

Another person, again not a witness, drove the tractor to Baltimore. After unsuccessfully attempting to hook up a trailer, that driver "got mad and came back and left it on the vacant lot in Frederick." Mr. Veirs telephoned the driver that night. Angry words passed between them, with Mr. Veirs saying: "You know that I am not going to give you a recommendation for driving tractor trailers."

Mr. Veirs thereafter personally drove the tractor from Frederick to Rockville and placed it on appellant's parking lot. It remained there until another tractor of appellant

"burned up" while attempting to haul "too much of a load for the tractor to handle." The operator of that other tractor sought and obtained permission to use the subject tractor. The witness then "started the tractor; drove it a couple of hundred feet; checked the oil and water; hit the tires to see if they had air in them; but not getting down to check the belt and hoses." He checked the water by taking the cap off and found that there was water in the radiator. The tractor then was delivered into the possession of E. Richard Notnagle, who testified that it "stayed there in idle for 15 minutes" and then was driven away by him. Within a mile after leaving the parking lot "the starter started pulling down * * * and by the time I got off the road it stopped and locked up. I raised the hood and I could see the puddle of water. Small puddle. The radiator hose was off. Q. What hose was off? A. The rubber piece of hose maybe 4, 5 inches long." He said that the end of the hose toward the engine was off, hanging down below the pipe with its other end still affixed to the pipe. The clamp on the loose end was still on the hose. He added: "We put the hose back on by pushing up the rubber hose and tightening the clamp. Q. You put the end of the hose back over the pipe? A. Yes. Q. Did that fit loose or tight? A. Rather tight to get it on there. Q. How loose was the clamp; how many turns, do you recall? A. It was loose. It was more or less hanging there. Q. Did you have to loosen the clamp up to get it back over the lip of the pipe? A. No sir — yeah. I had to loosen a little bit."

The "freeze up" of the engine caused damage of approximately $5400.00.

The witness Alvin B. Veirs was recalled and gave the following testimony:

"Q Tell us what number of ways that hose could have come free from the pipe?

A There is no way for it to vibrate. The only way I know it could have gotten off is being loosened up by a screwdriver.

Q What other ways could the hose have come free from the pipe?

THE COURT: He said the only way was that if it were loosened by a screwdriver."

At the end of the plaintiff's case Judge Ralph W. Powers, sitting by special assignment in the Circuit Court for Montgomery County, granted motions by Veirs Agency and Myers for a directed verdict. This appeal is from the judgment thereafter entered.

### Loss Caused by External Discharge or Leakage of Water

In *Government Employees Insurance Company v. DeJames*, 256 Md. 717, 261 A. 2d 747, the Court of Appeals said at page 720 [749]:

> "It is well settled that in interpreting insurance contracts, words are to be given their customary and normal meaning. Absent ambiguity the construction of the contract remains within the province of the court and Maryland has not adopted the rule, followed in many jurisdictions, that an insurance policy is to be most strongly construed against the insurer. If the language of an insurance contract is ambiguous, however, construction is for the jury, * * *." [Citations omitted]

Appellant argues that the language of the insurance contract is ambiguous and should be interpreted to include water flowing from within the radiator, suggesting that such water was being "externally discharged" and was "leakage of water." We find no ambiguity and regard the suggested interpretation as tortured. Appellant has cited no case supporting its suggested interpretation and we have found none. "External" is the key word in the coverage phrase. We find that it relates to the insured vehicle and covers losses sustained when that vehicle has been subjected to damage from water coming from an outside source (other than rain, which is expressly excluded by other policy provisions). The only cases in which the phrase has been given appellate consideration,[1] factually quite different from

---

1. *Henry v. Dubuque Fire & Marine Ins. Co.*, 185 S.W.2d 658 [Missouri].
   *Poole v. Sun Underwriters Ins. Co. of N. Y.*, 274 N. W. 658 [S. Dak.].
   *Glens Falls Insurance Co. v. McCown*, 236 S.W.2d 108 [Texas].

the subject case, have interpreted it as having application to an outside assault by water upon the protected vehicle.

## Malicious Mischief and Vandalism

Appellant contends that loss through malicious mischief or vandalism may be shown by circumstantial evidence, citing *Lanza Enterprises, Inc. v. Continental Insurance Co.*, 142 So. 2d 580, wherein it was said at page 582:

> "Ordinarily, destruction by acts of vandalism are not committed in the open view of witnesses by those intending to be identified and apprehended. To hold that circumstantial evidence cannot be used to prove the intentional destruction of the property would, in most instances, defeat the intended object of securing insurance against loss by vandalism * * *."

Maryland is in accord with that legal principle. *Duncan v. State*, 5 Md. App. 440, 446, 248 A. 2d 176, 179.

*Duncan* makes clear that the words "malicious mischief" do not necessarily connote actual ill-will or resentment and recognizes that: [p. 445; 179] "either a specific intent to cause the destruction, injury, defacement or molestation of the property of another, or an act done in wanton and wilful disregard of the plain and strong likelihood of such harm, without any justification, excuse or substantial mitigation" will suffice to establish its presence. See also note 23 A.L.R.3d 1263, Secs. 3(a) and 3(b).

In the subject case we find no legally sufficient evidence of any act taken with specific intent to harm; nor any showing of a course followed by another in wanton and wilful disregard of a likelihood of harm.

*Lanza Enterprises, Inc., supra,* is factually inapposite. There the court said at page 582: "It took a deliberate act to turn on the faucet and under such circumstances the deliberately turning and leaving the water on full force (which would obviously cause damage), evidenced the deliberate intention to damage the building."

Here the evidence relied upon to show malicious mischief or vandalism consists solely of a statement by Mr. Veirs that "there is no way for it [the hose] to vibrate," "the only way it could have gotten off is being loosened up by a screw driver." The angry words exchanged between Veirs and the disgruntled truck driver occurred days before and many miles distant from the point of damage, with the vehicle in the interim having been driven a substantial distance without damage. There is no evidence of tampering or even of an opportunity for tampering with the hose. Mr. Veirs himself partially inspected the cooling system on the very day of loss. He said that he had "checked the oil and water * * * not getting down to check the belt and hoses" and found "water in the radiator." Notnagle testifed that it was necessary "to loosen the clamp up to get it back over the lip of the pipe" after the damage had occurred. To suggest that one bent upon "malicious mischief or vandalism" would have partially loosened the clamp rather than have removed the hose, is entirely speculative.

Mr. Veirs' testimony is consistent with initial failure adequately to tighten the new hose; or a subsequent failure to check its renitency after use; or an inadvertent loosening by another; or a separation of the hose and pipe occurring under the strain of a heavy load, such as had caused another tractor to "burn up" under Notnagle. The evidence that "malicious mischief or vandalism" produced the damage complained of does not rise above the level of surmise, possibility or conjecture. This is not enough. *Arshack v. Freeman Ass'n,* 260 Md. 269, 278, 272 A. 2d 30, 35.

The trial judge did not err in granting the motions for directed verdict. Plaintiff did not offer evidence legally sufficient to prove a loss falling within policy provisions.[2]

### Rejected Opinion Evidence

Appellant's final contention is that the trial judge erred when he sustained objection to two questions asked of the

---

2. Damage from "wear and tear" and from "mechanical breakdown or failure" was excluded from coverage by other policy terms.

witness A. B. Veirs. The first such question was: "Based on your experience with truck maintenance since 1946 and the work you did on this truck, do you have an opinion as to what caused the Kenworth to lose its water? In sustaining the objection the trial judge said: "I am inclined to agree with the defendant that he has to say more about what he found as to the condition before he can give an opinion on it. The record is very much lacking in information for him to express an opinion." Our examination of the record shows that there had been no prior testimony by any witness as to the condition of the hose and its connection to the radiator system at the time the damage was suffered. Moreover, it affirmatively appeared that the witness had no personal knowledge concerning this.

In *State Health Department v. Walker*, 238 Md. 512, 209 A. 2d 555, it was said at page 520 [559]:

"An expert opinion derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert. *Doyle v. Rody*, 180 Md. 471, 25 A. 2d 457. The premises of fact must disclose that the expert is sufficiently familiar with the subject matter under investigation to elevate his opinion above the realm of conjecture and speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown "

When recalled after the witness Notnagle had described the circumstances surrounding the "freeze up" of the motor, Mr. Veirs was asked a second question to which objection also was sustained, *i.e.* "Do you have an opinion Mr. Veirs — and only answer yes or no — as to how the hose described by Mr. Notnagle came loose?" That question is similarly defective. The jury could not conceivably have known the factual base assumed by the witness to support his answer. The objections were properly sustained.

*Judgment affirmed.*
*Costs to be paid by appellant.*