JAMES J. UHLIK, AN INFANT, ETC. ET AL. *v.*
ADALBERT P. KOPEC, JR.

[No. 414, September Term, 1973.]

*Decided February 15, 1974.*

The cause was argued before MOYLAN, GILBERT and LOWE,
JJ.

*H. Albert Korn,* with whom was *David L. Saltzman* on the
brief, for appellants.

*Daniel O'C. Tracy, Jr.,* with whom were *James H. Cook*

and *Cook, Mudd, Murray & Howard* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellants, and plaintiffs below, James J. Uhlik and Eunice Uhlik (his mother), appeal from a judgment entered in a jury case in the Circuit Court for Baltimore County in favor of the appellee, and defendant below, Adalbert P. Kopec, Jr. The appellants claim that they were erroneously foreclosed from establishing, by an expert witness, the unlawful speed of the defendant's automobile. The litigation resulted from an accident on November 14, 1968, at about 5:00 p.m. when the defendant's automobile struck the infant plaintiff, James J. Uhlik, age five, on Holabird Avenue near its intersection with Maxwell Avenue in Baltimore County, just east of the Baltimore City Line.

Holabird Avenue runs generally in an east-west direction and is straight as it approaches the Baltimore City-Baltimore County line, coming eastbound from the city. Forty-eight feet east of this boundary line, it begins to curve to the left and continues to curve, going eastward, for 308 feet. The Midway Petroleum Building (referred to at the trial as "the bank building") is located at the center point of this curve, on the north side of Holabird Avenue. Maxwell Avenue runs generally in a north-south direction and intersects Holabird Avenue at a non-right angle and does not extend north beyond it. It lies west of the bank building. At the time of the accident, there was no marked pedestrian crosswalk across Holabird Avenue at its intersection with Maxwell Avenue. A plat of the area, however, extending the sidewalk on the west side of Maxwell Avenue across Holabird Avenue indicated that the infant plaintiff was within this unmarked crosswalk at the time of the accident. A barber shop lies on the north side of Holabird Avenue where this unmarked crosswalk begins. At the place of the accident, Holabird Avenue was on a 4.5 percent downgrade or slope for westbound traffic.

At about 4:30 on the afternoon of November 14, 1968, the defendant left his place of employment and proceeded in a

northerly direction along Sollers Point Road, which runs generally north-south, on his way home. He testified that his tires had good tread "all the way around" and that his brakes were in good condition. It was dusk as the defendant stopped for a traffic light at the intersection of Sollers Point Road and Holabird Avenue. He then turned left onto Holabird Avenue and proceeded in the lane closest to the center line. There were no cars in front of him. There were no cars parked along the north curb of Holabird Avenue. There was room for a car to his right. It was a clear day, the road was dry, and the road was in good condition — with no loose surface and no holes but with some ripples. The defendant testified that he was familiar with Holabird Avenue from Sollers Point Road down to Dundalk Avenue. He traveled that road to and from work everyday for about six or seven years. He knew that Maxwell Avenue intersects Holabird Avenue. He testified that he actually increased his speed to 20-25 miles per hour as he approached the bank building. The curve around that building is very sharp and he could not see around the building "down to the barber shop pole." He did not reduce his speed as he rounded the curve. His car was approximately on an even line with the westernmost edge of the bank building when he first saw the infant plaintiff standing on the north curb of Holabird Avenue. He testified that he had traveled two more car lengths when the child stepped into the road. The defendant did not sound his horn, but did swerve his car to avoid hitting the child "head on" and simultaneously applied his brakes. His wheels locked, and he skidded on an arc into the eastbound lane and then back into the westbound lane, striking the plaintiff. The point of impact on the two-door sports car was the rear portion of the side window of his right door. The defendant testified that his speed at the time of impact was between 15 and 20 miles per hour.

Officer Andrew Hartman, of the Accident Investigation Division, arrived on the scene approximately 15. minutes after the accident. He testified that the weather was cloudy, and it was dark, but that the illumination was good. The road surface of Holabird Avenue was blacktop macadam. It

was dry. It was smooth from the bank building to the city-county line, with no defects and no foreign material on it. The officer testified that he observed skid marks on Holabird Avenue laid down by the defendant's automobile and that all four wheels locked and left skid marks. The skid marks extended for 58 feet.

Lieutenant Charles M. Gross, of the Baltimore City Police Department, was called as an expert witness on behalf of the plaintiffs to express an opinion, on the basis of the skid marks, as to the speed the defendant was traveling at the time of the accident. Lt. Gross testified that he was assigned to the Accident Investigation Division of the Department from 1947 to 1969. He was in command of that division from 1959 to 1969. During the course of his 22 years with the AID, he investigated or supervised the investigation of over two thousand accident cases each year. He regularly made tests to determine the speed at which a vehicle had been traveling by examining the skid marks left at the accident scene. In addition, during his time with the AID, he instructed men in the AID on accident investigation and taught accident investigation at the police academy. He testified that he both attended the University of Maryland and took courses offered by the Traffic Institute of Northwestern University, which included supervision of police personnel, traffic law enforcement, accident investigation, supervision of traffic activities, and supervision of fleet transportation. The courses related to accident work, safety, and the supervision of traffic activities and accident investigation. The courses included material on the estimation of the speed of a vehicle from the presence of skid marks. Lt. Gross's qualification as an expert was accepted without question.

Lt. Gross then testified that there are four essential variables one must know in order to determine the speed of a vehicle: the length of the skid marks, the type of road surface, whether all four wheels locked, and the slope or grade of the road. It is one of these variables, the type of road surface, which determines the coefficient of friction. The "coefficient of friction" is the degree of resistance of the

road to the skidding of the vehicle's tires. He went on to explain how the coefficient is arrived at:

> "As an example, if I may, an automobile weighing two thousand pounds, if all four wheels were locked on this automobile and you put a tow test on it to move it, and it would take two thousand pounds of energy to move it, two thousand divided by two [thousand] would be one, or it would be a hundred percent coefficient of friction. However, if it only took one thousand pounds to move this two thousand pound vehicle under the same conditions, one thousand divided by two [thousand] would be a half, or it would be a fifty percent coefficient of friction. It is this friction between the tires and the roadway."

He testified that the formula generally accepted in the field to determine the speed of a vehicle from the length of the skid marks, which formula was taught to him at the University of Maryland and which is based on "the law of gravity of a free fall," is five and one-half times the square root of the length of the skid marks times the coefficient of friction plus or minus the grade of the road, to wit, $5.5 \sqrt{\text{length of skid}} \times (CF \pm \text{grade})$.

Lt. Gross further testified that there are other "non-essential" variables that do have some effect on the speed of a vehicle. These "non-essential" variables include the type of tires on the car, whether they were properly inflated, wind direction (whether the vehicle was going into a headwind or tailwind), the air temperature, and the road temperature. He testified, however, that "by giving a maximum and minimum [speed], they fall well within my estimate in this particular case." He stated that in order to determine the speed, it was not necessary for him to inspect the car itself or to make test skids and that it did not make any difference what type of car was used or the weight of the car.

Lt. Gross was then asked the following question based on facts already in evidence:

". . . assuming that on November 14, 1968, the type
of the road surface was blacktop macadam, was
dry, was in good condition, was no defects in the
road, no foreign substances or loose materials on
the roadway; assuming that the road was on a 4.5%
downgrade, could you tell us, first of all, the range
of the effective coefficient of friction?"

He answered that the minimum coefficient of friction was
fifty-five and a half percent and the maximum was
seventy-five and a half percent.

Before direct examination was resumed the defendant was
permitted to cross-examine the witness concerning the
foundation for this opinion. On cross-examination, it was
elicited that Lt. Gross did not inspect the surface of Holabird
Avenue in the vicinity of the accident on or about November
14, 1968, and that he did not check with the governmental
authorities to see when Holabird Avenue was last paved,
what its average daily traffic count was during 1968, what
the condition of the westbound lane in the vicinity of the
accident was on November 14, or whether it had any ripples
in its surface, caused by heavy traffic. It was further
brought out that the age of the road surface and the amount
of transmission grease and oil dropped from traffic would
lower the coefficient.

Lt. Gross testified that he determined the minimum
coefficient of friction in the instant case from his experience
and his studies at the University of Maryland. He testified
that in "hundreds and hundreds" of tests he had performed
in both Baltimore City and Baltimore County on a hard, dry
surface, clear of defects, such as the road in the present case,
the lowest coefficient of friction had been 70 percent. He
lowered his minimum figure 10 percent below that, to 60
percent, subtracted a 4.5 percent downgrade, and arrived at
an effective minimum coefficient of friction of 55.5 percent.
He based his estimate on the road being a blacktop macadam
surface in good condition with no foreign material on it and
no defects. He testified again that the minimum and
maximum coefficient he assigned to the road surface would
allow for all non-essential variables.

The court refused to allow the witness to express his opinion, based on the formula testified to, as to the minimum and maximum speed the defendant was traveling. The court reasoned:

"I am convinced that Lieutenant Gross is eminently qualified, but I, also, feel that I am convinced that he lacks the factual information necessary to testify in this particular case. I base that on the fact that he is not familiar with the roadway. He has never looked at it. He does not know the age of the road, whether it is traffic polished, as he says. My further reason for not permitting him to testify further would be the fact that this accident was investigated by an Officer Hartman who testified that he was on — and, incidentally, was with the Eastern Traffic Division of Baltimore County — and who testified that he was on the police force for some eight years and two months. . .

. . . I think that the question could have been put to Lieutenant (sic) Hartman. In other words, he had a chance to observe the skid marks and investigated the whole accident, was familiar with the roadway . . ."

The court then additionally noted:

"In addition to excluding Lieutenant Gross, because I felt that he was not sufficiently informed, there is, also, another reason that the testimony in the case as to the surface of the road was in conflict, one witness saying it was good, the other witness saying it was good but it had ripples in it."

Lt. Gross discounted the presence or absence of ripples in the road surface as one of the "non-essential" variables which he had already placed in proper perspective. He explained that rippling did have some effect, in a scientific and precise sense, upon the coefficient of friction, but that, in a practical sense, the effect was "infinitesimal." He explained that allowance was made for this "infinitesimal"

variation within the range he had assigned for the coefficient of friction.

After the court refused to allow Lt. Gross to express his opinion, while suggesting that Officer Hartman might have been qualified to render such an opinion, plaintiffs' counsel responded that Officer Hartman, notwithstanding his investigation of the accident, did not have the requisite training, in dealing with formulas or coefficient of friction, to express an expert opinion as to speed. A detailed proffer was then made by the plaintiffs' counsel as to what Lieutenant Gross's testimony would have been. Essentially, his testimony would have established that, in his opinion, the defendant at the beginning of his skid was traveling at a minimum speed of 31.19 miles per hour, at a maximum speed of 36.39 miles per hour and at a probable speed of 33.88 miles per hour.

To express an opinion, an expert witness must have the necessary qualifications as well as the factual information essential to form such an opinion. *Spence v. Wiles*, 255 Md. 98; *Murphy v. Bd. of County Comm'rs*, 13 Md. App. 497; *Beckner v. Chalkley*, 19 Md. App. 239. The trial judge conceded that Lt. Gross was "eminently qualified" to express an opinion as to the speed of a vehicle based on skid marks on a road surface but felt that he did not possess sufficient factual information in the instant case on which to base such an opinion. In essence, the court felt that Lt. Gross should have made a personal inspection of Holabird Avenue to determine the coefficient of friction, since he was not familiar with the age of the road and whether it was traffic polished, factors directly affecting the determination of the coefficient.

The requirement that an expert witness must predicate his opinion on a sufficient factual foundation seeks to avoid an opinion based on mere conjecture, speculation, or incompetent evidence. The premises of fact on which the opinion is based need not, however, have been derived from personal observation. The opinion may be based on an assumed set of facts in the form of a hypothetical question. Thus, a witness, who has been qualified to express an

opinion on a certain subject, whether based on personal knowledge and observation or in response to a hypothetical question, must make clear the observed or assumed facts upon which the opinion is based. *Marshall v. Sellers*, 188 Md. 508; *State, Use of Stickley v. Critzer*, 230 Md. 286; *Nizer v. Phelps*, 252 Md. 185; *A.B. Veirs, Inc. v. Myers*, 19 Md. App. 330.

Although not based on personal observation of the roadway, Lt. Gross's determination of the coefficient of friction was not based on mere conjecture or speculation. Officer Hartman, in his testimony, described the road surface of Holabird Avenue. Sufficient facts were in evidence and were summarized in the hypothetical question to allow Lt. Gross to assign a coefficient of friction. To allow for any possible imprecision in his knowledge, which might have been resolved by direct observation, Lt. Gross did not assign a precise coefficient of friction; he assigned rather an outer range. In fixing the minimum end of the range, he gave all benefit of the doubt to the defendant and then added an additional margin of error in the defendant's favor.

He testified that in all of his wide experience, based upon "hundreds and hundreds" of scientific experiments he had performed on road surfaces such as that of Holabird Avenue, in no instance had a blacktop macadam road, dry and with no defects, had a coefficient of friction of less than 70 percent. Lt. Gross took this rock-bottom minimum figure and then arbitrarily lowered it an additional 10 percent in determining the minimum end of the coefficient range for Holabird Avenue. He ventured that this coefficient significantly favored the driver and gave him the benefit of any doubt as to the minimum speed he was driving. He testified that on a hard surface such as Holabird Avenue, even snow has a coefficient of friction of 60 percent. He explained fully how he arrived at his determination that a hard road surface which is dry and clear of any defects would not have a lower coefficient of friction than 60 percent. In the light of all the facts in this case, Lt. Gross's failure personally to inspect the road surface would go, at most, to the weight of his testimony and not to its

admissibility. See *Graham v. Rolandson*, 435 P. 2d 263, 271 (Mont. 1967); *Thomas v. Harper*, 385 S.W.2d 130 (Tenn. 1964); *Tate v. Borgman*, 92 N.W.2d 697 (Neb. 1958); *Cherry v. State Automobile Insurance Assn.*, 310 P. 2d 907 (Kan. 1957); *Monday v. Millsaps*, 264 S.W.2d 6 (Tenn. 1953); Annotation, "Opinion Testimony as to Speed of Motor Vehicle Based on Skid Marks and Other Facts," 29 A.L.R.3d 248.

We cannot say that the erroneous exclusion of this evidence was not prejudicial to the plaintiffs. The only other evidence as to the speed which the defendant was traveling at the time of the accident was his own testimony. He testified that he was going between 20 and 25 miles per hour as he rounded the bank building and was going between 15 and 20 miles per hour at the time of impact. The excluded testimony of Lt. Gross, on the other hand, would have indicated that the defendant was going in excess of the 30 miles per hour posted speed limit at the beginning of his skid. Such speed might well have been found by the jury to have contributed directly to the accident.

In view of our required reversal of the judgment and remand of the case on this point, it is unnecessary to reach the other two contentions raised by the appellants.

> *Judgment reversed; case remanded for a new trial; costs to be paid by appellee.*