Circuit Court for Prince George's County
Case No. CAL1430313

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 364

September Term, 2016

_____

JOSEPH BASSO

v.

JUAN CAMPOS, ET AL.

_____

Eyler, Deborah S.,
Kehoe,
Shaw Geter,

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed: July 27, 2017

In 2011, Joseph Basso, the appellant, purchased a home in Hyattsville from appellees Javier Szuchman and Jose Rodriguez, both licensed real estate agents, who were agents of appellee Juan Campos, d/b/a Campos & Associates Realty, a real estate broker. Within weeks of the closing, Basso's basement flooded, and it continued to flood regularly in the following months and years. Basso sued the appellees in the Circuit Court for Prince George's County for negligent misrepresentation, fraudulent misrepresentation, violations of the Maryland Consumer Protection Action ("CPA"), Md. Code (1975, 2013 Repl. Vol.), sections 13-101–13-501 of the Commercial Law Article ("CL"), and, as to Campos, negligent hiring and supervision and vicarious liability for the tortious conduct of Szuchman and Rodriguez. The appellees' motion for summary judgment was denied.

The case was tried to a jury. At the close of Basso's case, the court granted the appellees' motion for judgment on all counts. Basso appeals, presenting two questions, which we have reordered and rephrased:

> I. Did the trial court err by precluding his expert home inspector from expressing an opinion on whether the basement of the home would have flooded during the period when Szuchman and Rodriguez owned the property?

> II. Did the trial court err by granting the appellees' motion for judgment?

For the following reasons, we answer the first question in the affirmative and shall reverse the judgment of the circuit court and remand for further proceedings. In light of our resolution of that issue, we need not address the second question.

## FACTS AND PROCEEDINGS

On July 29, 2011, Szuchman and Rodriguez purchased a 2-story single-family home at 6010 39th Avenue in Hyattsville ("the Property"). They bought the Property for $119,000, at a foreclosure sale. The Property, built in 1938, is a 1,300 square-foot bungalow-style home that had an unfinished walk-up basement.

Szuchman and Rodriguez planned to renovate and resell the Property for a profit. They hired contractors who replaced the roof and all the windows, remodeled the kitchen, and refinished the hardwood floors. In the basement, they installed drywall, replaced and relocated the sump pump, constructed a bathroom, and installed wall-to-wall carpeting.

Szuchman and Rodriguez listed the Property for sale on September 25, 2011, roughly two months after they bought it. Basso viewed the Property at the end of September, made an offer, and, on October 2, 2011, entered into a contract to purchase the Property for $260,000. The contract was contingent upon a home inspection.

Also on October 2, 2011, Szuchman and Rodriguez signed the Maryland Residential Property Disclosure and Disclaimer Statement ("Disclosure Statement"). As pertinent, they represented that they had owned the Property for 3 months and had no "actual knowledge" of any "leaks or evidence of moisture" in the basement.

On October 13, 2011, Basso's home inspection was completed. His home inspector did not note in his report that there was any evidence of flooding or water seepage in the basement. He did note, however, that the exterior basement stairwell drain should be kept clear of debris to prevent water from entering the basement under the exterior basement door.

The sale closed on November 14, 2011 and Basso moved in, along with a housemate.

On December 7, 2011, while Basso was traveling for work in San Diego, his housemate called to alert him that "there was water in the basement." The housemate believed that the water was entering from under the exterior basement door jamb, at the bottom of the exterior stairwell. Basso hired MCC Services, a water remediation company, to clean up the basement.

Four months later, on March 1, 2012, Basso noticed that the carpeting in the basement was "wet along the . . . back wall and the side wall." He pulled up the carpet and could see "areas where there was obviously water seeping in from the foundation." He also noticed upon pulling up the carpet that there was "an area of concrete that[ was] a different color," with some of the concrete appearing to be "newer." Basso was not aware that any concrete work had been done in the basement during the renovation.

On April 18, 2012, Basso obtained from the Bartley Corporation an estimate of $19,649 for concrete work on the Property to address the water infiltration problems. He decided not to go forward with the work at that time.

During 2012 and 2013, the basement at the Property flooded "[e]very time there was a substantial rainstorm or, . . . continued [sic] rain over a few days, any time that . . . [it rained] a half inch . . . and up[.]" The water would "seep in from . . . numerous places along the back wall and the wall where the door was . . . [a]nd depending on the amount of rain or the amount of ground saturation, it would just keep going."

In July 2013, Basso became concerned about mold in his basement and hired Larry Hammond, a certified home inspector and certified mold remediation contractor, to perform a "General Grading and Water Infiltration Inspection." Hammond did not detect any mold in the basement. The cost for the inspection was $350.

In April 2014, Basso contracted for B-Dry, a water-proofing company, to install French drains along the inside of the exterior walls of the basement and to take other measures to permanently solve the water infiltration issues.[1] B-Dry offers a lifetime warranty for its services. In May 2014, Basso hired another company to replace the exterior basement door and door frame.

On November 13, 2014, Basso filed suit against the appellees. The operative complaint is the third amended complaint, filed on February 16, 2015. Basso alleges that when Szuchman and Rodriguez signed the Disclosure Statement on October 2, 2011, they had actual knowledge that the basement area flooded repeatedly and that they had attempted to conceal this defect by removing bushes that lined the side of the home and replacing them with poured concrete. Counts I and II asserted claims for negligent and fraudulent misrepresentations, respectively; Counts III, IV, and V asserted claims for breach of the CPA; and Counts VI and VII asserted claims against Campos for vicarious liability and negligent hiring and supervision. Basso sought more than $250,000 in compensatory damages and $800,000 in punitive damages, plus attorneys' fees.

---

[1] In the context of this case, "French drains" are trenches, which contain gravel or rocks and a perforated pipe, dug around the inside perimeter of a basement. They are designed to redirect groundwater to a sump pump after the water has penetrated the exterior wall.

On July 17, 2015, Basso designated two expert witnesses: Howard Phoebus, a real estate agent, as an expert on valuation of real property, as well as the standard of care; and Larry Hammond, who, as mentioned, is a certified home inspector, as a standard of care and causation expert. Basso specified that Hammond was expected to testify that the appellees "knew about the regular water intrusions into the basement area . . . and [that] rather than try to appropriately put money to fix the problem, adopted the strategy to 'temporarily' conceal the flooding, by pouring concrete around a significant portion of the stairwell."

The appellees moved for summary judgment, arguing that there was "no admissible competent evidence that either Rodriguez or Szuchman were aware of any flooding in the [Property] prior to sale." Basso opposed the motion, attaching, among other exhibits, excerpts of Rodriguez's and Szuchman's depositions, in which they testified that they were present at the Property every day during the 4-5 week renovation period, and an affidavit by Hammond, opining that it was "virtually impossible that Mr. Rodriguez and [Mr.] Szuchman would not have experienced [during that time period] the same significant level of flooding problems that Mr. Basso first experienced on or about December 7, 2011, about 3 weeks after the . . . closing took place." Hammond further opined that there was no "justified reason" for concrete to have been poured around the basement stairwell except to "conceal (temporarily and ineffectively) the flooding problems." By order entered March 16, 2016, the court denied the motion for summary judgment, ruling that Szuchman's and Rodriguez's deposition testimony that they were present at the Property nearly every day for a month during the renovation created a

genuine dispute of material fact about their knowledge of flooding in the basement when they signed the Disclosure Statement.

A jury trial commenced on March 28, 2016. Over two days, Basso testified and called five witnesses: Szuchman, Campos, Phoebus, Hammond, and Daniel Seger, a neighbor who lived directly across the street. He introduced into evidence certified records from the Storm Events Database for the National Climatic Data Center ("NCDC"), a division of the National Centers for Environmental Information at the United States Department of Commerce. Those records covered storm events in Prince George's County and surrounding areas over 184 days between July 1, 2011, and December 31, 2011. The records reflected that during the period between July 29, 2011, when Rodriguez and Szuchman purchased the Property, and September 25, 2011, when the Property was listed for sale, there were multiple storm events involving significant rainfall. Most notably, on August 27-28, 2011, Hurricane Irene "tracked up the Mid-Atlantic Coast . . . pass[ing] by just to the east of Ocean City, Maryland," resulting in tropical storm conditions throughout Maryland, including in Prince George's County, and causing 12 inches of rain to fall in some areas.

Also, on September 7-8, 2011, "the remnants of Tropical Depression Lee interacted with a nearly stationary boundary near the Mason-Dixon Line" and resulted in "[m]ajor flooding and flash flooding" around Maryland. As a result of the "record-setting rainfall" on those days, the "[g]round across Maryland was saturated" leading to additional flooding on September 9, 2011, from thunderstorms and showers.

No storm events involving heavy rainfall were reported after September 9, 2011, until December 7, 2011, the day Basso's basement flooded for the first time after he took title. On that date, rainfall totals in the area were as high as 4.36 inches.

Basso testified consistent with the above stated facts. He further testified that he learned for the first time during Szuchman's and Rodriguez's depositions that they had poured concrete "on the side of the house" during the renovation.

On cross-examination, Basso was asked whether it was his understanding that when the basement flooded on December 7, 2011, the water came in under the basement door. He replied, "On the 7th, yes." He further testified that he did not recall having cleared the drain in the exterior basement stairwell between the date he settled on the house (November 14, 2011) and December 7, 2011. Basso recalled that upon returning from his business trip in December 2011, he observed "debris in the stairwell." He agreed that if the basement drain was clogged, water may have come in through the basement door as a result.

Two remediation reports prepared by MCC regarding the December 2011 and March 2012 flooding incidents were introduced into evidence. The first report specified that MCC had taken steps to address "loss resulting from the water that was entering the house from underneath the door jamb at the bottom of the [basement] stairwell where water was coming through cracks that had formed over the newly repaired and painted sides of the exterior stairwell." Even after the rain stopped, MCC had to suspend its remediation efforts for some time because water still was being "released from the ground, through the cracks in the sides of exterior[] walls and then coming in underneath

the doorway into the house." After the water stopped entering the house, MCC returned to redo its extraction process and then to dry the basement with heaters and fans. The total cost for MCC's services in December 2011 was $4,552.55.

The second MCC report reflected that it performed remediation services in March 2012 after water "seeped through the wall of the basement underneath the side door of the house." The total cost for those services was $1,000.87.

Szuchman testified that within a few days of purchasing the home, he and Rodriguez hired three men to begin the renovations.[2] The men began work within "[a] couple days," in early August 2011. At his deposition, Szuchman had testified that the contractors began work within a "week or ten days." According to Szuchman, the contractors started with the basement. The entire renovation was complete within four to five weeks, and the Property was listed for sale "a week or ten days" after completion. Szuchman and Rodriguez were present at the Property nearly every day during that renovation period.

Szuchman testified about concrete being poured around the exterior of the Property, on the left side if facing it from the street. He explained that there was a "cracked—cracking walkway [to the left of the house] . . . [a]nd in between the walkway and the house was a like—two feet of bushes or something like that." He and Rodriguez decided to remove the bushes "[t]o make the house look better."

---

[2] The men may have worked for a company called Carlos Construction, but Szuchman could not recall.

After the bushes were removed, a subcontractor poured concrete on the cracked walkway to repair it. The subcontractor had extra concrete and asked if he should also pour it in the area where the bushes had been. Szuchman explained that he had noticed that the water flowed in the direction of the home, so he thought it "was [a] good idea [to] make [it] level to keep the water coming out the house . . . . [b]ecause . . . if not, in the future you can have pooling inside the house." Szuchman believed that the concrete was poured at the end of August, 2011.

Szuchman did not recall any major rainstorms during the renovation period, but was sure it had rained some days. He testified that there was "no flooding" in the basement while he was present at the Property and that none of the workers ever told him about flooding in the basement.

According to Szuchman, he and Rodriguez were working for Campos at the time of the renovation subject to a flat-fee agreement whereby Campos would receive $500 at settlement. Campos never came to the Property and knew "nothing about [it]," however.

Campos testified that he had been a real estate broker since 1998 or 1999. Szuchman and Rodriguez were real estate agents affiliated with his brokerage company. He estimated that over the last decade he had received brokerage commissions on more than 25 homes sold by Szuchman and Rodriguez. He trained all of his agents about latent defects disclosures that sellers must make under Maryland law. Because in this case Szuchman and Rodriguez were the agents and the sellers, it was their obligation to complete the Disclosure Statement.

Phoebus was accepted as an expert in the field of real estate ethics.[3] He testified about the relationship between a real estate broker and real estate agents, and about duties relative to the latent defects disclosure.

Seger testified that he had lived in the house across the street from the Property for 16 years. He recalled that five or six years earlier, the Property had been vacant for about a year. Around the end of August 2011, Seger saw workers "coming up with concrete out of the basement" and "putting it underneath the front porch." He assumed that the basement was being dug out and remodeled. He also observed workers pouring fresh "concrete[] all around the front porch and down to the basement where it used to be— flower beds and mulch, from the basement steps all the way around to the front entrance."

Hammond was admitted as an expert in home inspection and water infiltration. He testified that the bills submitted by the company that replaced the exterior basement door and by MCC all were fair and reasonable. He testified that the $8,150 bill for the waterproofing by B-Dry was too high and that a fair and reasonable price for the services performed would have been $7,200.

In Hammond's opinion, the only way to permanently correct the water infiltration problems at the Property would be to "dig down all the way around it, like four to six inches below the footings . . . . [and] put a drain pipe," followed by "re-parg[ing] and re-

---

[3] The court precluded Phoebus from testifying about valuation and causation. That ruling is not challenged in the instant appeal.

tar[ing] the walls" and covering the tar with plastic sheeting. In addition, he would recommend "elevat[ing] the grades" to prevent water from "ponding" on the Property.

Hammond also testified about his observations of the Property in 2013. He had immediately noticed that the "driveway . . . close[] to the basement areaway was very low and ponding"; that the downspouts on an adjacent house "discharge[ed] towards [the Property,]" and that the drain at the bottom of the basement stairwell "did not have the capacity to carry water away in any large amount."

Hammond was asked whether there was a "way . . . to know whether or not [the Property] flooded" "before Mr. Basso owned [it]." He responded that the best way to determine that would be to excavate the basement walls and foundation to check for "calcification" or "water stains." Barring that, the only information he could rely upon was "grading." It did not appear to Hammond that "anybody had been digging around there to settle the grade" and, in his view, the "grade [wa]s the problem with this house."

Hammond opined that pouring concrete in place of mulch or other soft material can be a way to stop water infiltration. He was shown photographs of the basement floor taken by Basso that showed a variation in the color of the concrete. Hammond opined that it looked like "French drains" had been put in and then new concrete had been put on top.

As we shall discuss in more detail, *infra*, Hammond was not permitted to offer an opinion about whether, based on his observations of the Property in July 2013, the Property would have had "flooding issues" prior to Basso's purchasing it and, more specifically, during the period that Rodriguez and Szuchman owned it.

At the close of Basso's case, the appellees moved for judgment on all counts. On Counts I through V, defense counsel argued that Basso had not adduced any evidence, "circumstantial or otherwise, that [on October 2, 2011], [any of the appellees] were aware of or knew of any issues of flooding with that basement." The only evidence bearing on the crucial period of time between July 29, 2011, and October 2, 2011, was that concrete was poured on the left side of the house and it rained. On Count VI, defense counsel argued that Campos could not be vicariously liable as a matter of law because Rodriguez and Szuchman were independent contractors, not employees, and, in any event, Rodriguez and Szuchman were not liable, and therefore he was not vicariously liable. On Count VII, negligent hiring and supervision, defense counsel argued that there was no evidence that Campos had any involvement in supervising Szuchman and Rodriguez in their capacity as the owners and renovators of the Property.

The court granted the motion for judgment on all counts. It opined that the evidence showed that the "first flood" in the basement occurred on December 7, 2011, and was caused by a "clogged drain." It ruled that Basso failed to meet his burden to show that any of the appellees had knowledge of "water or flooding conditions or a wet basement" during the time in which they held title to the Property. The court described Basso's theory of prosecution as a "syllogism": "because it rained, therefore the basement flooded, because that is what happened on December 7th after settlement." The court rejected the notion that evidence of rainfall amounts during the period when Szuchman and Rodriguez held title was sufficient to prove knowledge. It noted that Basso could have produced testimony from a "prior owner," "[b]anking officials"

-12-

involved in the foreclosure, or "neighbors" with actual knowledge of flooding issues predating Basso's ownership of the Property, but did not do so.

The court entered judgment in favor of the appellees on April 19, 2016. This timely appeal followed.[4]

## DISCUSSION

### I.

Basso contends the trial court abused its discretion by precluding Hammond from expressing an expert opinion about whether the Property would have experienced flooding during the three month period when Rodriguez and Szuchman held title to it. The appellees respond that the court correctly precluded Hammond from testifying about conditions at the Property nearly two years before he inspected it because he lacked an adequate factual basis to offer that opinion.

Hammond had been a home improvement contractor since 1959 and had been licensed since 1965. He began working as a home inspector in 1999; and he became licensed in 2007, when the State first required licensing. He was certified by the National Association of Certified Home Inspectors as a water infiltration specialist. He testified that in assessing a water infiltration issue, he determines whether there were "low and ponding areas around [a] house [that] [would] allow water to get in around the foundation."

---

[4] The appellees filed a post-judgment motion for attorneys' fees pursuant to Rule 1-341. That motion has been stayed pending the resolution of the instant appeal.

The court accepted Hammond as an expert in home inspection and water infiltration for the purpose of testifying with "respect to the bills that have been submitted in this case, as to whether in his opinion they are fair and reasonable." Defense counsel objected to Hammond's testifying about whether the remediation work reflected in those bills was necessitated by any misrepresentation or fraud by the appellees. The court ruled that it would "deal with that as and if it arises."

In preparing for his testimony, Hammond reviewed the MCC remediation reports and other bills and estimates about the water infiltration. He also reviewed the NCDC records about storm events before and after Basso purchased the Property and photographs of the Property before and after the bushes were removed.

Hammond was permitted to testify about his observations of the Property in July 2013, when Basso hired him to complete a grading and water infiltration inspection. He noted grading issues, particularly near the driveway on the left side of the house. He also observed that the exterior stairwell drain did not have sufficient "capacity to carry water away in any large amount." He further opined that the "grading . . . ha[d] settled considerably around the back of the house and the right-hand side of the house," whereas the left side of the house had had concrete poured in order "to try and head off any water infiltration."[5] The "grading" was the major issue with the Property, in Hammond's view.

_____

[5] Defense counsel's objection to Hammond's testifying about the "motivation" for the pouring of the concrete was sustained. He did not move to strike Hammond's answer, however. In any event, Szuchman already had testified that the concrete was poured to correct a grading issue and to direct water away from the foundation of the house.

Hammond was asked on direct whether, based upon his inspection of the Property in 2013, he had an opinion as to whether "this particular house – had flooding or water intrusion" prior to Basso's purchasing it. Defense counsel objected and the court sustained the objection, noting that Hammond was being asked "if he has an opinion . . . in 2011 for a house he examined in 201[3]."

Later, Basso's counsel asked Hammond to opine, based on his experience and his review of the records in this case, whether the Property would have "had flooding issues prior to Mr. Basso's arrival at the house?" Defense counsel objected, the objection was sustained, and Basso's counsel asked for a bench conference. The court remarked that the question called for "[a]bsolute speculation" because Hammond had "no objective data as to what occurred in the—about the two months that the Defendants owned this property[.]" Basso's counsel countered that there was a factual basis for Hammond to testify that it was "virtually certain based on the rain amounts [during that two month period] and the characteristics of [the Property]" that it would have flooded in August and September 2011. He argued, moreover, that Hammond should be permitted to offer an opinion about whether a house that flooded during the December 7, 2011 storm event more likely than not also would have flooded during the August 27-28, 2011 storm events and the September 7-9, 2011 storm events. The court interjected that the December 7, 2011 flooding was caused by the exterior drain being "clogged [because Basso] had not cleared it, according to his own testimony." Basso's counsel disagreed that that was his testimony.

Later in Hammond's direct examination, Basso's counsel asked him whether anything had stood out to him in the NCDC records. He responded that there had been "four or five big storms . . . some . . . that had ten inches of rain." He continued that "if there was a problem in this basement, based on the settled grading around this house—." Defense counsel objected and his objection was sustained. Basso's counsel then asked: "Well, based on your review and your expert opinion and your experience can you say whether there would have been water infiltration from these storms?" Defense counsel objected and the court sustained the objection, remarking, "Just speculation. He has testified objectively to the things he can testify to. He cannot speculate."

Basso's counsel then asked Hammond about the December 7, 2011 storm and the resulting water infiltration. He followed up by asking: "Would a house stop—not flood . . . if facing substantially similar or even worse weather conditions earlier?" An objection to that question was sustained. He tried rephrasing that question twice, ultimately asking: "If a house is found to flood on a certain day what factors could possibly affected [sic] it f[rom] flooding or not flooding in earlier circumstances?" An objection to that question also was sustained, and the court asked counsel to approach the bench.

The court advised Basso's counsel that Hammond had "testified to all the things he can testify to, fairness to the bills [sic], with respect to mold, water infiltration, how (Inaudible), how he thinks it should be done. And he cannot suddenly come in here and start testifying as to conditions that predated whenever he looked at the [P]roperty."

Basso's counsel argued that Hammond was qualified to offer an opinion that "this house, particularly based on the outside, where there is no evidence that anything had

changed substantially, would have flooded in earlier circumstances particularly in view of the significant storms that took place during the three and a half months." He elaborated, "you know, a house does not suddenly stop flooding and I think he can explain why a house does not suddenly stop flooding."

The court reiterated that it was sustaining the objection because Hammond's opinion about whether the Property would have flooded in August and September 2011 was "nothing but speculation." Basso's counsel was directed to "find another field of inquiry" or the court would "start interrupting [him] and terminate it."

> Rule 5-702 provides that a trial court may admit expert testimony if it
>
> determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

"[E]xpert testimony must be sufficiently definite and certain to be admissible, for neither the Courts nor the juries are justified in inferring from mere possibilities the existence of facts, and they cannot make mere conjecture or speculation the foundation of their verdicts." *Porter Hayden Co. v. Wyche*, 128 Md. App. 382, 391 (1999) (citations omitted). "[T]rial courts have 'wide latitude in deciding whether to qualify a witness as an expert or to admit or exclude particular expert testimony,' and we review the trial court's decision for an abuse of discretion." *Lewin Realty III, Inc. v. Brooks*, 138 Md. App. 244, 276 (2001), *abrogated on other grounds by Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594 (2011) (quoting *Massie v. State*, 349 Md. 834, 850–51 (1998)).

In the case at bar, the trial court determined that Hammond was qualified by "knowledge, skill, experience, training, or education" to testify as an expert in home inspection generally and water infiltration specifically. The court ruled that Hammond lacked a sufficient factual basis, however, to testify about whether the Property flooded (or was likely to have flooded) during storm events that happened when the appellees held title because that testimony was too speculative, in the court's view. The court also did not permit Hammond to opine about any "factors" that might cause the basement of a house to start flooding, even if it had never flooded previously. We agree with Basso that the court abused its discretion in so ruling.

Hammond inspected the Property in July 2013, less than two years after Rodriguez and Szuchman renovated it. He observed obvious grading problems that would cause water to pool near the foundation and a drain at the bottom of the exterior stairwell that had insufficient capacity. There was no evidence that Basso had altered the grading of the Property in the interim between purchasing it and hiring Hammond. Hammond reviewed storm event data showing that the area in which the Property was located had experienced a hurricane and a tropical depression over the two week period at the end of August 2011 and the beginning of September 2011, prior to the renovation being completed.

Hammond was not required to have personally observed the condition of the Property during the period when Szuchman and Rodriguez held title in order to offer an opinion about whether a house with grading problems similar to those Hammond observed in 2013 likely would have flooded during a major storm. *See, e.g., Uhlik v.*

-18-

*Kopec*, 20 Md. App. 216, 223 (1974) ("The premises of fact on which [an expert] opinion is based need not . . . have been derived from personal observation."). Hammond also had a sufficient factual basis to opine as to whether a basement that, according to Basso, flooded every time it rained more than a half an inch from December 2011 forward, also would have flooded when it rained close to 10 inches in a two day period in August 2011. The fact that Hammond had not personally observed the condition of the Property in October 2011 went to the weight, not the admissibility, of his testimony.

The erroneous exclusion of Hammond's testimony was prejudicial. Basso sought to prove by circumstantial evidence that the basement at the Property flooded every time it rained a half inch or more after he took title that Szuchman and Rodriguez had actual knowledge of water infiltration in the basement of the Property when they held title to it; that Szuchman and Rodriguez were present at the Property every day in August and early September 2011; that it rained extreme amounts during that period of time; and that it was not plausible that the water infiltration problems began only after Basso took title. The court granted judgment in favor of the appellees because it concluded that Basso failed to adduce any evidence that the basement ever flooded while Szuchman and Rodriguez held title. Had Hammond been permitted to testify, consistent with his affidavit in opposition to the motion for summary judgment, that it was "virtually impossible" that the basement would not have flooded in August and September 2011, during the time when Szuchman and Rodriguez were present nearly every day, there clearly would have been sufficient evidence, viewed in a light most favorable to Basso, to

-19-

survive a motion for judgment.[6]  In light of this prejudicial error, reversal is required and

we need not consider whether Basso adduced sufficient evidence to overcome a motion

for judgment without the improperly excluded expert testimony.

> **JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES.**

---

[6] The court also misconstrued Basso's testimony about the cause of the December 7, 2011 flood at the Property.  The court repeatedly stated that Basso acknowledged that the cause of that flood was a clogged drain.  He did not so testify.  He acknowledged that most of the water had come under the basement door, but did not testify that the drain was clogged or that that was the only source of the flooding on that date.  Moreover, the MCC remediation report made clear that water had continued to flow into the house for several days after the storm ended, which is inconsistent with a flood caused by a clogged drain.